CERVECERÍA CORONA, INC., demandante y recurrida, *v.* FRANCISCO LIZARDI, SECRETARIO DE OBRAS PÚBLICAS, y RAMÓN GARCÍA SANTIAGO, PRESIDENTE DE LA JUNTA DE PLANIFICACIÓN, demandados y recurrentes, y COCA–COLA BOTTLING COMPANY OF PUERTO RICO, demandante y recurrida, *v.* FRANCISCO LIZARDI, SECRETARIO DE OBRAS PÚBLICAS, y RAMÓN GARCÍA SANTIAGO, PRESIDENTE DE LA JUNTA DE PLANIFICACIÓN, demandados y recurrentes.

*Números:* R-66-319, R-66-320 *Resueltos:* 28 de febrero de 1969

---

*J. B. Fernández Badillo, Rafael A. Rivera Cruz, Procuradores Generales, J. F. Rodríguez Rivera, Subprocurador General, y Peter Ortiz, Procurador General Auxiliar,* abogados de los recurrentes; *Iván Reichard y Hermán W. Colberg,* abogados de las recurridas.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

Se plantea en estos recursos la validez del *procedimiento* establecido en la Ley Núm. 5 de 28 de septiembre de 1961, 9 L.P.R.A. secs. 38a *et seq.,* para la eliminación sumaria de rótulos y anuncios instalados en violación a las leyes y regla-

mentos de zonificación. (¹) No se cuestiona—con buen juicio—
la facultad de la Asamblea Legislativa para prohibir y regla-
mentar estos letreros justificada no sólo por razones de se-
guridad sino también de estética. *Village of Euclid* v. *Ambler
Realty Co.*, 272 U.S. 365 (1926); *Ghaster Properties, Inc.*
v. *Preston*, 200 N.E.2d 328 (Ohio 1964); *Murphy, Inc.* v.
*Westport*, 40 A.2d 177 (Conn. 1944). Véase además: Gard-
ner, *The Massachusetts Billboard Decision*, 49 Harv. L. Rev.
869 (1936).

A principios de siglo hubo serios reparos en los Estados
Unidos a considerar la estética como un fundamento válido
para el ejercicio del poder de razón de estado (*police power*).
Véase Cox, *Outdoor Advertisements—Aesthetics And The
Public Right*, 33 Tul. L. Rev. 852, 857; Pound, *Jurisprudence*,
vol. 1, pág. 436; Rodda, *The Accomplishment of Aesthetics
Under The Police Power*—27 So. Cal. L. Rev. (1954). Hubo
casos en que hasta se llegó a considerar la estética asunto
de mero lujo, insuficiente para sostener el ejercicio del poder
de reglamentación del estado. *Passaic* v. *Patterson Bill Post-
ing Co.*, 72 N.J.L. 285 (1905):

"Las consideraciones estéticas son más bien materia de lujo
y de indulgencia que de necesidad y solamente la necesidad jus-
tificaría el ejercicio del poder de razón de estado para incautarse
de propiedad privada sin compensación." Id. 268.

Sin embargo, gradualmente los tribunales fueron recono-
ciendo la estética como un interés social importante y cre-
ciente en la consecución del bienestar general. *General Out-
door Advertising Co.* v. *Dept. of Public Works*, 193 N.E. 797
(Mass. 1935); *Churchill & Tait* v. *Rafferty*, 32 J.F. 614
(Filip. 1915); Cox, *supra*.

■ La tendencia moderna, la cual compartimos, es defi-
nitivamente aceptarla por sí sola como un fundamento vá-

---

(¹) Ley Núm. 427 de 13 de mayo 1951, 9 L.P.R.A. secs. 31–38, y
Reglamento de Anuncios & Rótulos en las Carreteras 9 R.&R.P.R. secs. 35–1
*et seq.*

lido para el ejercicio del poder de razón de estado. El Tribunal Supremo de los Estados Unidos ha sentado ya las bases para esta nueva tendencia en *Berman* v. *Parker*, 348 U.S. 23, (1954) expresando con propiedad que:

"El concepto de bienestar general es amplio e inclusivo. . . . Los valores que representa son tanto de carácter espiritual como físico, estéticos tanto como pecuniarios. Es facultad inherente de la legislatura determinar que la comunidad sea bella a la vez que saludable, tan espaciosa como limpia, tan bien balanceada como bien protegida." Id. 33.

Admitida así la facultad legislativa para prohibir y reglamentar estos letreros, nuestra tarea se limita a considerar solamente si el procedimiento establecido en la citada Ley Núm. 5 cumple o no con las garantías del debido proceso de ley.

Las recurridas Cervecería Corona, Inc., y Coca-Cola Bottling Company of Puerto Rico radicaron en el Tribunal Superior, Sala de San Juan, una solicitud de sentencia declaratoria para que se declarase inconstitucional la Ley Núm. 5, *supra*, por el fundamento de que el procedimiento en ella establecido no provee a las partes afectadas la oportunidad de ser oídas antes de que el Secretario de Obras Públicas proceda a la remoción de los rótulos y anuncios instalados ilegalmente. El tribunal de instancia accedió, concluyendo que no siendo los rótulos o anuncios estorbos públicos *per se* no podían ser eliminados sin la celebración previa de una vista en la cual los recurridos tuviesen la oportunidad de ser oídos y donde se adjudicara sobre el alegado uso ilegal.

Apoyándose en comentarios vertidos en la opinión de *Whitmier & Ferris Co.* v. *N.Y. Thruway Authority*, 242 N.Y.S.2d 386 (1963),[2] el tribunal de instancia resolvió:

---

[2] En dicho caso la Corte de Apelaciones de Nueva York se declaró sin jurisdicción. No obstante, si para algo pudiera utilizarse es para sostener todo lo contrario a lo que resolvió el tribunal de instancia. Véase el

"14. Resolvemos al igual que el Tribunal Supremo de Nueva York [*sic*] que solamente unas circunstancias extremas que envuelvan un peligro de reciente creación extremadamente perjudicial a los conductores de vehículos en nuestras calles y carreteras puedan justificar las acciones del Secretario de Obras Públicas eliminando anuncios de la demandante bajo el procedimiento sumario autorizado por la Ley Núm. 5. Como bien apunta la demandante el hecho de que un anuncio de cerveza 'Corona' en vez de estar adosado a una pared de acuerdo con los requisitos técnicos del Reglamento de Zonificación, esté a dos pulgadas de la misma, no convierte al inocente anuncio en un instrumento de 'extrema peligrosidad' ni crea una situación de emergencia que no pueda esperar una adjudicación administrativa o judicial después de una vista en los méritos antes de poderse eliminar. Por lo tanto, no se justifica constitucionalmente tal desviación de los principios de debido procedimiento de ley como la que encontramos en la Ley Núm. 5."

La sentencia es errónea y no debe prevalecer. Un análisis objetivo de las disposiciones de la Ley Núm. 5, de su historial legislativo y sus precedentes y de los principios de derecho relativos a la eliminación de estorbos públicos así lo demuestra.

■ Nuestra función primaria es la de establecer, o velar porque se establezca, (³) un balance adecuado entre el interés

---

sumario, del cual copiamos:

"Un estatuto que autoriza a la Autoridad de Carreteras a suprimir y remover *sin notificación alguna* anuncios instalados a una distancia determinada del pavimento, constituye un ejercicio válido del poder de razón de estado, y, aun cuando el dueño del anuncio tuviera derechos que quedaron anulados por dicho estatuto, ello no es base suficiente para declararlo inconstitucional." (Énfasis nuestro.)

El caso de *Whitmier* claramente reconoce la validez del estatuto de Nueva York y cita con aprobación a *N.Y. State Thru. A.* v. *Ashley Motor Court*, 218 N.Y.S.2d 640 (1961) que declaró constitucional dicho estatuto.

(³) Advertimos la discrepancia de criterios sobre el carácter de esta función en *Saia* v. *New York*, 334 U.S. 558 (1948). El Juez Douglas sostuvo en dicho caso el criterio de que corresponde a los tribunales establecer un balance de los intereses en conflicto al pasar sobre la constitucionalidad de una ley. Por el contrario, el Juez Jackson confirió esa fun-

público en la eliminación sumaria del estorbo y el interés individual en que no se lesionen indebidamente derechos de propiedad. El enfoque debe ser más bien pragmático que teórico, de análisis ponderado de los factores subyacentes que motivan la política pública.

■ Ello nos lleva a considerar el origen, propósito y alcance del estatuto; los remedios que el mismo provee para proteger a las personas afectadas de posibles desmanes o arbitrariedades por parte de los funcionarios encargados de aplicar la ley y los remedios judiciales disponibles fuera del estatuto. Es de fundamental importancia en el análisis del estatuto considerar la existencia de remedios judiciales adecuados para la protección de los derechos de propiedad. Advertimos, sin embargo, que en la consideración de lo que es o no adecuado no venimos necesariamente obligados por las doctrinas y principios establecidos en casos que envuelven funciones administrativas distintas, como por ejemplo, expropiaciones, confiscaciones, revocación de licencias o adjudicación de compensación por accidentes del trabajo.

II. El procedimiento establecido en la Ley Núm. 5 es la culminación de un largo esfuerzo legislativo de más de medio siglo por fomentar la seguridad y el bienestar en nuestra vías públicas y preservar el ornato y la belleza natural del paisaje. La acción legislativa en este campo se inició con la aprobación de la Ley Núm. 55 de 10 de marzo de 1910, 10 L.P.R.A. secs. 313–320. Dicha ley prohibió la instalación de letreros y anuncios en propiedades pertenecientes al Estado Libre Asociado, o sujetas a servidumbres

ción a la legislatura expresando que:

"Corresponde a la comunidad balancear sus propios intereses—eso es una función política—de la cual deben abstenerse los tribunales de intervenir. Nuestra única función es la de aplicar restricciones constitucionales."

Véase además: Murphy & Pritchett, *Courts, Judges And Politics, An Introduction To The Judicial Process*, pág. 438, Random House (1961).

a favor de éste, reglamentó los anuncios y rótulos instalados en edificios comerciales, impuso un impuesto anual a dichos anuncios y declaró delito menos grave cualquier infracción a la misma. Posteriormente se aprobó la Ley Núm. 427 de 13 de mayo de 1951, 9 L.P.R.A. secs. 31 a 38, prohibiendo la instalación de anuncios dentro de una distancia de 500 metros a ambos lados del eje de las carreteras, excepto en las áreas en donde estuviese en vigor el Reglamento de Zonificación y éste otra cosa proveyera. También facultó a la Junta de Planificación y otros funcionarios públicos a iniciar la acción judicial correspondiente para la supresión o modificación de dichos anuncios.

Ninguno de los métodos utilizados por la Asamblea Legislativa—imposición contributiva, responsabilidad delictiva, interdictos—dieron resultado. El esfuerzo legislativo resultó completamente inadecuado, multiplicándose extraordinariamente los rótulos y anuncios ilegales. *Diario de Sesiones*, vol. 14, pág. 215, (1961). [4] La Exposición de Motivos de la Ley Núm. 5 describe ampliamente el fracaso de los procedimientos anteriores y la necesidad de adoptar un procedimiento más efectivo como es la destrucción sumaria:

---

[4] Al considerarse en el hemiciclo de la Cámara el P. de la C. 383, que luego se convirtió en la Ley Núm. 5, el Representante Ortiz expresó:

"Ahora bien, *la experiencia ha demostrado que los métodos de ejecución, los métodos utilizados en la Ley básica para hacer efectiva la ley, han resultado ser completamente inadecuados para eliminar este mal social, tal como se dispone en el Proyecto.* Los infractores no han cumplido en forma alguna las disposiciones de esta ley y estos anuncios y rótulos se multiplican extraordinariamente y continúa su presencia, aparte o independientemente de las prohibiciones que contiene la ley en sí. Por ejemplo, un inventario hecho de anuncios de enero a abril de '61, reveló que había por lo menos 629 anuncios en contra de la ley, y ese número se ha aumentado posteriormente, en lo que se refiere al procedimiento de 'injunction'. *El trámite establecido en vista del problema de la congestión de los tribunales, la tardanza en llevar a cabo estos procedimientos de 'injunction', todos estos factores han establecido graves dificultades para hacer cumplir los propósitos de la ley . . ."* (Énfasis nuestro.)

*"Exposición de Motivos*

La Ley Núm. 427, de 13 de mayo de 1951, según enmendada, y las disposiciones del Reglamento de Zonificación sobre rótulos y anuncios, constituyen uno de tantos esfuerzos del Gobierno para ofrecer protección adecuada al pueblo de Puerto Rico. La citada Ley Núm. 427 de 1951 estableció un régimen que, para esa época, se consideró lo suficientemente efectivo para erradicar de las zonas adyacentes a nuestras carreteras cierto tipo de anuncio o rótulo, según estos conceptos se definieron en dicha ley, que tiende a provocar accidentes de tránsito. *Sin embargo, ni la vigilancia constante ni otras formas de acción gubernamental, adoptadas luego de ser aprobada dicha ley, y luego de entrar en vigor las referidas disposiciones del Reglamento de Zonificación, han logrado suprimir centenares de anuncios y rótulos instalados y mantenidos ilegalmente en diversos lugares de la Isla.* Ante la grave amenaza que conlleva este tipo de rótulo o anuncio, y con el propósito de proteger la salud, la seguridad y el bienestar de la ciudadanía; de promover el mejor uso y desarrollo de nuestras carreteras; de proteger y preservar el ornato público en las áreas urbanas y rurales y de conservar el paisaje natural y fomentar el turismo, se aprueba esta ley, para crear un medio que imprima mayor eficacia para lograr la eliminación de rótulos o anuncios que indiscutiblemente distraen la atención del automovilista, causan detrimento y obstrucción indebida al uso adecuado de nuestras carreteras y, a pesar de constituir un grave riesgo para la seguridad del tránsito, y perjudicar el ornato público, han sido instalados y mantenidos en violación flagrante a las disposiciones de la Ley Núm. 427, de 13 de mayo de 1951, según enmendada, y del Reglamento de Zonificación autorizado por el Artículo 9 de la Ley Núm. 213 de 12 de mayo de 1942." (Énfasis nuestro.)

 El tribunal de instancia, al revisar la validez del estatuto, no podía ignorar esta infructuosa experiencia legislativa en la formulación de un remedio efectivo. Debió tomar en consideración no sólo el mal social que se intentó proscribir, sino también, las múltiples dificultades que revelan el récord legislativo en la aplicación de medidas correctivas. Ello constituía consideraciones importantes de política pú-

blica, que son esenciales en la determinación de la razonabilidad y necesidad del procedimiento sumario. Conviene recordar que en el desempeño de la delicada misión de revisar la validez de estatutos, los tribunales deben respetar la discreción legislativa, sin expresar—porque no nos atañe—opinión sobre la sabiduría o conveniencia del estatuto. *McCormick* v. *Marrero*, 64 D.P.R. 260 (1944); *Cintrón* v. *Corte*, 67 D.P.R. 793 (1947); *Pueblo* v. *Saldaña*, 69 D.P.R. 711 (1949).

III. Veamos ahora en detalle el procedimiento establecido en la citada Ley Núm. 5:

1. La Junta de Planificación certifica periódicamente al Departamento de Obras Públicas los anuncios y rótulos que no cumplen con las disposiciones de la Ley Núm. 427, *supra*, y del Reglamento de Zonificación. En virtud de esta certificación, el Secretario de Obras Públicas requiere, mediante notificación por escrito al dueño, arrendatario, etc. del terreno o edificio en que se haya instalado el anuncio, así como al anunciante de su agente, que elimine dicho rótulo o anuncio dentro de 30 días a partir de la notificación. Art. 2, 9 L.P.R.A. sec. 38b.

2. Una vez transcurrido el término de 30 días, el Secretario de Obras Públicas o el funcionario en quien delegare, ordena que se suprima, quite o destruya el anuncio o rótulo en cuestión, y si tal anuncio o rótulo no fuere eliminado dentro de 10 días, se procederá a eliminarlo. Art. 3, 9 L.P.R.A. sec. 38c.

3. Si fuere necesario penetrar en propiedad privada para dar cumplimiento a dicha ley, el Secretario o su delegado deberá acudir ante un magistrado haciendo constar por escrito y bajo juramento los hechos que justifiquen la necesidad de penetrar en la propiedad privada. Si el magistrado halla la solicitud conforme a los términos de la ley, deberá expedir una orden autorizando al funcionario concernido a

penetrar en la propiedad privada, quien podrá entonces proceder a la eliminación del estorbo. Art. 4, 9 L.P.R.A. sec. 38d. (5) .

4. Se autoriza expresamente a la persona que sufra daños indebidamente por actuación de algún funcionario o empleado público en cumplimiento de dicha ley, a demandar en daños y perjuicios al Estado Libre Asociado, sin sujeción a los incisos (a) y (b) del Art. 6 de la Ley Núm. 104 de 29 de junio de 1955. Art. 5, 9 L.P.R.A. sec. 38e.

En síntesis, este procedimiento requiere: a) dos notificaciones a las personas afectadas, b) una declaración jurada y una orden de un magistrado cuando fuere necesario penetrar en propiedad privada, y, c) un remedio judicial a las personas que sufran daños indebidamente como consecuencia de actuaciones bajo los términos de ley. Según puede verse, las personas afectadas no quedan huérfanas de protección. La ley provee primero una notificación por escrito concediéndoles a las personas afectadas un aviso de treinta días, y, luego un requerimiento de diez días. El procedimiento no es tan sumario que impida a las personas afectadas comparecer dentro de esos términos ante el Secretario de Obras Públicas a hacer las reclamaciones que crean menester. Finalmente tienen en su beneficio una acción de daños y perjuicios en la cual pueden ventilar en los méritos sus contenciones contra la actuación administrativa y obtener el resarcimiento de los daños y perjuicios indebidamente sufridos. El estatuto provee, pues, amplia protección a los derechos de propiedad de las personas afectadas. En el derecho consuetudinario (*common law*) sólo se le reconocía a éstas una acción en daños. *Solly* v. *City of Toledo*, 218 N.E.2d 463

---

(5) Los requisitos exigidos por la ley para la expedición de estas órdenes son similares a los requeridos para las órdenes de allanamiento o registro autorizados por las disposiciones del Código de Enjuiciamiento Criminal (34 L.P.R.A. secs. 1811 y siguientes) y por la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico.

(Ohio 1966); *Hislop* v. *Rogers*, 92 P.2d 527 (Ariz. 1939); *State* v. *Keller*, 189 N.W. 374 (Neb. 1922); *People* v. *Board of Health*, 35 N.E. 320 (N.Y.C.A. 1893).

IV. En los Estados Unidos mucho antes de que aprobara la Constitución, el derecho consuetudinario reconoció como un ejercicio válido del poder de razón de estado la facultad del poder legislativo para declarar estorbos públicos y ordenar la destrucción de éstos sin un procedimiento judicial previo. *Lawton* v. *Steele*, 152 U.S. 133 (1833); *Upton* v. *Felton*, 4 F.Supp. 585 (1932); *State* v. *Keller*, supra; *Hislop* v. *Roger*, supra, facultad que se extiende tanto a la eliminación de estorbos públicos *per se* como a la eliminación de estorbos públicos declarados así por la Asamblea Legislativa. *Lawton* v. *Steele*, supra; *Daniel* v. *Homer*, 51 S.E. 992, 3 L.R.A. (N.S.) 997 (N.C. 1905); *Upton* v. *Felton*, supra; *contra State* v. *McCray*, 186 N.W. 280 (N.D. 1921). Por supuesto, el ejercicio de esta facultad no puede ser arbitrario ni opresivo. Tiene que responder a criterios de razonabilidad y necesidad.

■ Aunque se le reconoce a la legislatura amplia discreción para determinar los intereses sociales que reclaman protección y los medios necesarios para la protección de dichos intereses, ella no puede declarar estorbo lo que de hecho no lo es, *Lawton* v. *Steele*, supra. Tampoco la legislatura puede extender el remedio a más de lo necesario. Como consecuencia, no se debe destruir una edificación utilizada para fines ilícitos cuando basta clausurarla para suprimir dicho uso, como por ejemplo, prostíbulos, casa de juegos, etc.

■ En otras palabras, lo fundamental en la validez del procedimiento es su razonabilidad y necesidad y no la distinción que hizo el tribunal de instancia entre estorbos públicos *per se* y estorbos públicos por declaración legislativa, a los fines de justificar la eliminación sumaria de los primeros y no de los segundos.

Tampoco se justifica limitar el procedimiento sumario, como hizo el tribunal de instancia, exclusivamente a situaciones de emergencia. (6) No hay duda de que en éstas se hace más evidente el elemento de necesidad. (7) Pero hay múltiples casos en que el elemento de necesidad no es tan obvio y hay que acudir entonces, para poder cumplir cabalmente con nuestra función judicial, al origen del estatuto, sus precedentes y el historial legislativo. El proceso para determinar la existencia o no de necesidad y de razonabilidad tomará en cuenta los intereses sociales cuya protección motivó la aprobación del estatuto, la forma en que se protege los derechos de propiedad de las personas afectadas, la naturaleza del estorbo, incluyendo su valor, dificultad y los costos de procedimientos alternativos para eliminarlo.

Consideramos anteriormente la importancia que tiene para la comunidad la seguridad en nuestra carreteras y la preservación del ornato y belleza del paisaje, así como, la experiencia legislativa de más de medio siglo en tratar de proteger éstos intereses sociales. También consideramos los distintos remedios judiciales y extra-judiciales que tienen las personas afectadas para proteger sus derechos de propiedad. Procede ahora considerar los demás factores enumerados anteriormente.

La prueba demuestra que la gran mayoría de los letreros son de poco valor, que muchos de ellos están instalados en forma tal que hace su remoción costosa y arriesgada; que se trata de cientos de letreros, (8) cuya remoción por la vía

---

(6) Véase antes página 49 la Conclusión de Derecho Núm. 14 del tribunal de instancia.

(7) Tómese, por ejemplo, el caso de la destrucción de un perro rabioso o un toro salvaje suelto en la zona urbana, la decomisación de alimentos descompuestos, la vacunación en caso de epidemia, la destrucción de un edificio para impedir que un fuego se propague, etc.

(8) Véase escolio 4. Según un inventario de anuncios efectuado por la Junta de Planificación de enero a abril de 1961 reveló que había por lo menos 629 anuncios en contra de la ley.

judicial reduciría notablemente la eficacia del estatuto. Más aun, muchos de estos anuncios fueron instalados ilegalmente por los recurridos, ignorando los reglamentos de zonificación y de construcción. ([9])

El Tribunal Supremo de los Estados Unidos en *Lawton* v. *Steele*, supra, consideró factores muy similares a éstos al declarar válido un estatuto que ordenó la destrucción sumaria de redes de pesca, que al igual que los letreros, son objetos susceptibles de uso legal. Se trataba de un estatuto para la conservación de la pesca que declaraba estorbo público las redes y otros objetos de pesca que se encontrasen sobre o en los alrededores de determinados cuerpos de agua. El Tribunal Supremo expresó:

"La Legislatura, sin embargo, indudablemente poseía el poder de no sólo prohibir la pesca mediante redes en estas aguas, sino de declarar tal conducta delito y tomar tales medidas como fuesen razonablemente necesarias para prevenir dichos delitos en el futuro. Ciertamente, no se podía lograr esto más efectivamente que mediante la destrucción de los medios del delito. *Si las redes estaban siendo utilizadas en detrimento de los intereses del público, estamos convencidos de la facultad inherente de la Legislatura para declararlas estorbos públicos y autorizar a los funcionarios del Estado a eliminarlas. . . .*" Id. pág. 139. (Énfasis nuestro.)

Con respecto al argumento de que las redes no constituían estorbo *per se* sino que eran susceptible de uso legal, el Tribunal Supremo expresó:

"Muchos objetos, tales como por ejemplo, barajas, dados y otros artículos utilizados en juegos de azar, son perfectamente inofensivos de por sí, pero pueden convertirse en estorbos al ser dedicados a un uso ilegal, y en tal caso caer bajo la prohibición de la ley, pudiéndosele entonces destruir sumariamente. Ahora bien, estamos conscientes de que esta regla no opera en todos los casos de uso ilegal de un objeto inofensivo. Una casa no puede ser destruida por el hecho de que se dedique a un uso

([9]) Así fue admitido por los recurridos durante la vista ante nos.

ilegal, ya que igualmente puede ser utilizada con un fin legítimo . . . , pero en aquellos casos de objetos menores que se dediquen a un uso ilegal, el hecho de que puedan ser utilizados legítimamente no priva a la legislatura del poder de destruirlos. El poder de la legislatura para declarar estorbo aquello que sea perfectamente inofensivo de por sí es incuestionable . . . , y en tal caso la legislatura puede adicionar a la prohibición todas las consecuencias de un delito, incluyendo la destrucción de la propiedad declarada por ella estorbo público." Id. pág. 143.

El Tribunal Supremo federal sostuvo la validez del procedimiento sumario basándose en: a) el poco valor de las redes, b) la dificultad de removerlas en el agua, c) los riesgos y el costo de remoción, y, d) el hecho de que la eficacia del estatuto disminuiría seriamente si se requiriera un procedimiento judicial ordinario. Además, aunque el estatuto en cuestión no proveía para ello, tomó en consideración que las personas afectadas no quedaban huérfanas de remedio sino que podían reclamar las redes o su valor de los funcionarios ejecutivos. Como vimos anteriormente, nuestro estatuto provee mayor protección a los derechos de propiedad de las personas afectadas, ya que taxativamente establece una acción de daños y perjuicios mediante la cual se puede obtener el resarcimiento de todos los daños y no meramente el valor de los rótulos.

En resumen, tomando en consideración el esfuerzo de más de medio siglo de la Asamblea Legislativa por lograr un remedio efectivo para la eliminación de rótulos y anuncios instalados ilegalmente, que los derechos de propiedad de las personas afectadas quedan ampliamente protegidos, y la naturaleza del estorbo, concluimos que el procedimiento sumario establecido en la Ley Núm. 5 de 28 de septiembre de 1961 cumple a cabalidad con las garantías del debido procedimiento de ley.

*Se revocará la sentencia dictada por el tribunal de instancia y se dictará sentencia sosteniendo la constitucionalidad de la Ley Núm. 5 de 28 de septiembre de 1961.*

El Juez Presidente Señor Luis Negrón Fernández no intervino.