Miguel A. Díaz Martínez, demandante y recurrido, v. Poli-cía de Puerto Rico, demandada y recurrente.

*Número:* RE-92-31          *Resuelto:* 22 de junio de 1993

*Anabelle Rodríguez, Procuradora General, Reina Colón de Rodríguez, Subprocuradora General, y Laura Ydrach Vivoni, Procuradora General Auxiliar*, abogadas del recurrente.

El Juez Asociado Señor Hernández Denton emitió la opinión del Tribunal.

El Superintendente de la Policía suspendió sumariamente de empleo y sueldo a un policía estatal quien alegadamente tomó como rehén en un cuartel a otro miembro de la uniformada. Mediante solicitud de revisión recurre ante nos el Estado Libre Asociado de Puerto Rico y solicita la revocación de una sentencia del Tribunal Superior, Sala de San Juan, donde se determinó que el Superintendente no le concedió un debido proceso de ley al policía suspendido y se ordenó el pago retroactivo de salarios y beneficios desde la fecha de la suspensión hasta el momento de su expulsión definitiva de la Policía. Confirmamos.

## I

Como resultado de un incidente ocurrido en el Cuartelillo de la Policía en la Urb. Las Vegas de Cataño, el Ministerio Público presentó cargos contra el Policía Miguel Díaz Martínez por los delitos de robo, amenaza, restricción de libertad (dos (2) casos) y por violar el Art. 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 418. Simultáneamente, la Policía inició una investigación administrativa de los hechos. Como parte de esta investigación, fue citado para tomarle una declaración jurada. Cuando compareció a

ésta, se le informó que se le investigaba debido a los si-
guientes hechos:

[I]ncidente ocurrido el día 17 de agosto de 1989, en el Cuar-
telillo de la Policía de la Urb. Las Vegas de Cataño, donde usted
según se alega tomó como rehén al Policía Erick Aponte y soli-
citó la presencia del Superintendente de la Policía, Lcdo. Is-
mael Betancourt y Lebrón, para de esa forma manifestarle
cierta problemática que según usted no se le había dado
atención. Solicitud de revisión, pág. 2.

También se le informó que la investigación podría dar
lugar a la formulación de cargos y se le recordó sobre su
derecho a tener representación legal durante la toma de su
declaración jurada. Díaz Martínez fue acompañado por un
abogado de la Asociación de Miembros de la Policía y re-
husó hacer una declaración jurada sobre el incidente.

Concluida la investigación, ésta reflejó que el día de los
hechos imputados Díaz Martínez amenazó con matar a
una señora, le quitó una escopeta y un revólver a otro po-
licía y lo tomó como rehén. También encañonó a un sar-
gento y a un coronel de la policía que acudieron al lugar:

Reveló la investigación que el 17 de agosto de 1989, a eso de
las 8:00 p.m., en el Cuartel de la Policía de Cataño, se presentó
la señora Wanda M. Soto, residente en la Urbanización Los
Almendros de Bayamón, para querellarse que había sido agre-
dida por usted. Que además usted le había amenazado con
matarla.

Mientras la señora Soto era atendida por el Sgto. Reinaldo
Morales Rivera 8–1071, usted se personó al Cuartel y volunta-
riamente le entregó el arma de reglamento al Sgto. Morales
Rivera. Luego se marchó. Minutos más tarde se recibió una
llamada urgente en la Sala del Retén solicitando la presencia
del Sargento al Destacamento de Las Vegas Cataño, donde us-
ted había despojado mediante la fuerza al guardia Erick Aponte
Maysonet 16241 de su escopeta y revólver de reglamento. Allí
usted mantuvo apuntando al guardia Aponte cuando llegó el
Sargento Morales entonces apuntó a éste también. Le solicitó al
Sargento que quería hablar solamente con el Superintendente.
El Comdte. Juan Díaz Lago, Comandante del Area de Bayamón
trató de persuadirlo que desistiera de su actitud sin tener éxito.
El Coronel Fernando Vázquez Gely llegó al lugar y usted tam-

bién le apuntó con el revólver. Luego de un diálogo con este oficial usted entregó el arma.

El caso fue consultado con el Fiscal Waldemar Cima De Villa y el 28 de marzo de 1990, instruyó se radicaran denuncias por los delitos de Robo, Amenaza, Restricción a la Libertad (2 casos), Artículo 8 (2 casos), 5, 6, y 32 (3 casos) de la Ley de Armas. El caso fue sometido a la consideración del Honorable Juez Carlos S. Dávila, del Centro Judicial de San Juan, quien determinó causa probable en todos estos delitos, imponiéndole la fianza de $1,075 .00 la cual prestó. *Exhibit* III, págs. 1–2.

En vista de los hechos descritos anteriormente, el Superintendente determinó que Díaz Martínez incurrió en faltas graves proscritas por el Reglamento de Personal de la Policía y mediante una comunicación escrita formuló los cargos correspondientes. Simultáneamente, lo suspendió sumariamente de empleo y sueldo. En su carta, el Superintendente le apercibió que se proponía imponerle como castigo su expulsión del Cuerpo y le informó sobre su derecho a "solicitar una vista informal" ante un oficial examinador.

La vista informal fue celebrada el 5 de diciembre de 1990. Luego de evaluar la prueba presentada, el 20 de marzo de 1991 el Superintendente concluyó que las violaciones imputadas a Díaz Martínez se habían probado y ordenó su expulsión de la Policía, retroactiva a la fecha cuando había sido notificado sobre la suspensión sumaria de empleo y sueldo.

Con fecha de 25 de marzo de 1991, Díaz Martínez presentó ante el Tribunal Superior una acción de *mandamus* en la cual alegó que fue suspendido sumariamente de empleo y sueldo el 2 de mayo de 1990 sin que se le concediera previamente una vista informal. Señaló, además, que habiéndose celebrado la vista informal en diciembre de 1990, el Superintendente no había emitido su decisión. Sostuvo que había sido privado de su interés propietario sin el debido proceso de ley.

Después de ciertos trámites procesales y de haber sido informado acerca de la decisión final de la Policía, el foro

de instancia concedió a las partes un término para que mostraran causa por la cual no se debiera expedir el *mandamus* solicitado y ordenar al Superintendente que le pagase al policía destituido "todos los salarios y demás beneficios que dejó de percibir desde la fecha en que fue suspendido sumariamente y sin vista previa, y hasta la fecha en que se dictó por el Superintendente la decisión definitiva de expulsión, luego de celebrar la vista". *Exhibit* I, pág. 2. Después de la comparecencia del Superintendente, el Tribunal Superior requirió de las partes un memorando de derecho sobre si "la vista investigativa que se celebró ... cumpl[ía] con los requisitos exigidos por la jurisprudencia ... relativos a la vista previa al despido". *Exhibit* VII, pág. 1.

Como el Superintendente no contestó la última orden, el tribunal a quo infirió "de su repetido silencio un reconocimiento de que la vista investigativa que se celebró ... no cumple con los requisitos [aplicables]". *Exhibit* VII, pág. 1. Por ende, expidió el *mandamus* y ordenó al Superintendente que pagara a Díaz Martínez los salarios y beneficios dejados de percibir desde la fecha en la cual fue suspendido, hasta el día en que finalmente el Superintendente ordenó su destitución de la Policía.

El Procurador General recurre ante esta Curia y en su recurso impugna la sentencia del Tribunal Superior. Sostiene que el procedimiento utilizado en este caso cumplió con los requisitos del debido proceso de ley. Oportunamente expedimos el auto de revisión.

## II

■ "En Puerto Rico un empleado público tiene un reconocido interés en la retención de su empleo si dicho interés está protegido por la ley (empleado de carrera) o cuando las circunstancias crean una expectativa de continuidad." *Orta v. Padilla Ayala*, 131 D.P.R. 227, 241

(1992). Recientemente en *Cintrón Santana v. Supte. Policía de P.R.*, 131 D.P.R. 1 (1992), concluimos que las disposiciones relativas al principio de mérito, incluidas en la Ley de Personal del Servicio Público 'de Puerto Rico de 1975 (3 L.P.R.A. sec. 1334) aplican a la Policía de Puerto Rico. Una vez se le reconoció ese derecho a la Policía, el Estado no puede privárselo sin unas garantías procesales que cumplan con el debido proceso de ley. *Torres Solano v. P.R.T.C.*, 127 D.P.R. 499 (1990).

Por otro lado, tanto la Ley de Personal del Servicio Público de Puerto Rico, 3 L.P.R.A. sec. 1336(3), como la de la Policía de Puerto Rico, 25 L.P.R.A. sec. 1014(e), autorizan la suspensión de empleo y sueldo a cualquier policía, en ciertas circunstancias. En específico, el Art. 14 de la Ley de la Policía de Puerto Rico, 25 L.P.R.A. sec. 1014, concede al Superintendente el poder para suspender temporalmente de empleo y sueldo a aquel miembro del Cuerpo contra quien se haya imputado incompetencia, mala conducta o haber incurrido en un acto delictivo:

> (e)El Superintendente tendrá facultad para suspender temporalmente, de empleo y sueldo, a cualquier miembro de la Fuerza mientras se practica cualquier investigación que se ordenare relativa a incompetencia, mala conducta o crimen de que se acuse a dicho miembro de la Fuerza. En tal caso, el Superintendente hará que se formulen los correspondientes cargos, sin demora innecesaria. Investigará y resolverá tales casos a la mayor brevedad posible, imponiendo el castigo que estime razonable dentro de los límites de ésta o disponiendo que vuelva al servicio dicha persona con devolución de los sueldos devengados o sin ellos, durante el período de la suspensión, si a su juicio los hechos lo justificaren.
>
> (f)Cuando un miembro de la Fuerza estuviere suspendido de empleo y sueldo, por cualquier concepto, estará inhabilitado para ejercer sus funciones como tal. Tampoco disfrutará de los derechos y privilegios que por ley se conceden a miembros de la Policía mientras dure dicha suspensión.
>
> (g)En todo caso donde se impongan sanciones que conlleven la suspensión de empleo y sueldo, el Superintendente, a petición del querellado, podrá conmutar dicha sanción por servicios

adicionales al Cuerpo equivalente al monto de tiempo que dure la suspensión. 25 L.P.R.A. sec. 1014(e), (f), y (g).

Sin embargo, ni la Ley de Personal del Servicio Público de Puerto Rico ni la de la Policía de Puerto Rico requieren que se le provea a un policía la oportunidad de ser oído en una vista informal antes de una suspensión sumaria. No obstante, en *Torres Solano v. P.R.T.C.*, supra, pág. 523, reconocimos el derecho de un empleado público de carrera a una vista informal previa al despido "aun cuando el estatuto o contrato que le da derecho a permane[cer] en su puesto no provea para la celebración de una vista previa y sí para una vista formal con posterioridad al despido". Al amparo de las doctrinas establecidas en *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532 (1985), y en *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716 (1982), y considerando la naturaleza de los intereses particulares afectados, el riesgo de una decisión errónea y el interés gubernamental protegido, concluimos que de ordinario la celebración de una vista informal antes de la destitución promovía los mejores intereses de la administración pública. El empleado público de carrera "tiene ese derecho aun cuando el estatuto o contrato que le da derecho a permanencia en su puesto no provea para la celebración de una vista previa y sí para una vista formal con posterioridad al despido". *Torres Solano v. P.R.T.C.*, supra, pág. 523.

■ Igualmente, una suspensión sumaria priva a un empleado público de sus derechos propietarios a recibir un sueldo y unos beneficios marginales, y a desempeñar las funciones de su cargo. La suspensión de empleo y sueldo tiene unos efectos negativos inmediatos sobre el empleado, pues afecta particularmente su capacidad para generar ingresos y de sostener a su familia. Precisamente, debido a la naturaleza del daño causado al empleado público a causa de una suspensión sumaria, los tribunales no se han abstenido de preterir el cauce administrativo para evaluar si

el procedimiento utilizado cumple con el debido proceso de ley. *Vélez Ramírez v. Romero Barceló*, supra.

◼︎ Considerando que el interés propietario de un policía también se afecta sustancialmente por una suspensión de empleo y sueldo —y que esta decisión encierra determinaciones de hechos en las cuales existe un alto riesgo de un dictamen erróneo— de ordinario una vista informal previa reduce los peligros de que un procedimiento de esta índole le prive erróneamente de su interés propietario. Además, en términos del Estado, "la concesión de una vista previa promueve su interés de garantizar un servicio público eficaz, excelente, regular y productivo". (Énfasis suprimido.) *Torres Solano v. P.R.T.C.*, supra, pág 522.

No obstante, en *Cleveland Bd. of Ed. v. Loudermill*, supra, pág. 545, se reconoció que, en ciertas situaciones, la retención del empleado puede constituir un peligro significativo a la seguridad de otras personas o a la propiedad pública. En esos casos se puede decretar una suspensión sumaria, limitada solamente a excluirlo temporeramente del empleo, pero dejándole su sueldo y los beneficios correspondientes:

> Finally, in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay.

Esta excepción a la regla general —en los casos de empleados públicos— reconoce que ciertas circunstancias extraordinarias requieran la intervención temporal del Estado con los intereses de una persona antes de poderle brindar una oportunidad de ser oído. Tanto en Puerto Rico como en Estados Unidos se han reconocido situaciones en las cuales el Estado tiene que actuar rápidamente para garantizar el orden, la seguridad o la salud del pueblo, siempre que posteriormente provea una vista adjudicativa dentro de un término razonable de tiempo. En particular, cuando hay una emergencia, los tribunales han permitido

la actuación sumaria del Estado sin una vista previa, permitiendo una privación temporal de los derechos de una parte. En estos casos, corresponde a los tribunales hacer un balance de los intereses encontrados a la luz de las circunstancias peculiares de cada uno:

> The underlying idea in all the temporary action cases mentioned so far is that a sufficient urgency may override a particular party's interest in avoiding a temporary loss. Obviously, the opposing interests have to be balanced. 2 *Davis, Administrative Law Treatise* Sec. 11:12 (2da ed. 1979), pág. 391.

Por ejemplo, cuando alimentos contaminados o medicinas con etiquetas engañosas han estado a la venta en los comercios, se ha permitido su confiscación y destrucción sin una vista previa. Véanse: *North American Storage Co. v. Chicago*, 211 U.S. 306 (1908); *Ewing v. Mytinger & Casselberry*, 339 U.S. 594 (1950). No hay duda de que, en estas circunstancias excepcionales, la vista previa tendría el efecto de posponer la intervención gubernamental, poniendo en peligro la salud o la seguridad del pueblo.

Se ha permitido, de forma igual, una actuación drástica del Estado sin vista previa cuando se encuentra involucrada la solvencia de una institución bancaria que está en peligro, *Fahey v. Mallonee*, 332 U.S. 245 (1947); el embargo de una cuenta bancaria, *North Georgia Finishing, Inc. v. Di-chem, Inc.*, 419 U.S. 601 (1975); la suspensión de un estudiante por un término máximo de diez (10) días cuando se afecta la seguridad de otros alumnos, los maestros o la propiedad de la institución, *Goss v. Lopez*, 419 U.S. 565 (1975); la terminación de los beneficios por incapacidad bajo la ley de seguro social, *Mathews v. Eldridge*, 424 U.S. 319 (1976), y la confiscación de un barco con prueba delictiva, *Calero–Toledo v. Pearson Yatch Leasing Co.*, 416 U.S. 663 (1974). Además, hay otros remedios judiciales que tienen las personas afectadas para proteger sus derechos de propiedad. Véanse, además: *Adams v. Mi-*

*lwaukee*, 228 U.S. 572 (1913); *Newburgh v. Park Filling Station*, 298 N.Y. 649 (1948).

En *Cervecería Corona, Inc. v. Srio. Obras Públicas*, 97 D.P.R. 44 (1969), sostuvimos la validez del procedimiento sumario para la eliminación de ciertos rótulos y anuncios en las vías públicas establecido en la Ley Núm. 5 de 28 de septiembre de 1961 (9 L.P.R.A. sec. 38a *et seq.*). En esa ocasión sostuvimos que no "se justifica limitar el procedimiento sumario ... exclusivamente a situaciones de emergencia". *Cervecería Corona, Inc. v. Srio. Obras Públicas*, supra, pág. 56. Igualmente, en *Vélez Ramírez v. Romero Barceló*, supra, pág. 735, examinamos el procedimiento sumario establecido por la Ley Municipal para tratar querellas contra los alcaldes y aceptamos que existen "una serie de situaciones donde el interés protegido es de tal intensidad y naturaleza que es innecesaria una vista previa".

■    La normativa expuesta antes es también aplicable a las suspensiones sumarias de empleados públicos. No obstante, como en esos casos la suspensión afecta adversamente la capacidad del empleado para sostener sus vidas, en *Cleveland Bd. of Ed. v. Loudermill*, supra, se estableció que la acción sumaria tenía que limitarse al empleo mismo. Por ende, en los casos donde la continuidad en el empleo crea una situación peligrosa para el Estado o los intereses protegidos por el Gobierno, se puede suspender sumariamente de empleo a un empleado público sin la celebración de vista previa, siempre que continúe recibiendo el sueldo y se le ofrezca —en un término razonable de tiempo— una oportunidad de ser oído en una vista informal o en una en la cual se adjudique formalmente la controversia.

## III

En el caso de autos, el Procurador General sostiene que la toma de declaración jurada realizada como parte de la fase investigativa de la querella cumplió con el requisito de vista informal de *Cleveland Bd. of Ed. v. Loudermill*, supra. Además, aduce que no fue hasta después de ésta cuando se suspendió a Díaz Martínez de empleo y sueldo.

Del acta de lo ocurrido ese día se desprende que la toma de la declaración jurada era únicamente de naturaleza investigativa y que el interrogatorio que se llevó a cabo no puede clasificarse como la vista previa requerida por *Cleveland Bd. of Ed. v. Loudermill*, supra, y *Torres Solano P.R.T.C.*, supra. El procedimiento se limitó a informar a Díaz Martínez que se le iba a tomar una declaración jurada sobre los incidentes en el cuartelillo.

Además, surge claramente del acta que la Policía estaba llevando a cabo la investigación con el propósito de determinar si le formularían cargos y que, antes de esa fecha, todavía no se había determinado el curso de acción que se proponían seguir en su contra. Por eso, antes de esa ocasión, Díaz Martínez no fue notificado por escrito de los cargos en su contra. Tampoco se le apercibió con suficiente anticipación sobre la intención de suspenderlo de empleo y sueldo ni se le informó acerca de su derecho a una vista informal para presentar su versión de los hechos, según requerido en *Torres Solano v.. P.R.T.C.*, supra.

Sin un aviso de que en ese día se proponían celebrar una vista informal y sin una notificación adecuada de los cargos imputados en su contra, cualquier vista celebrada sería insuficiente para satisfacer la exigencia del debido procedimiento de ley de darle al empleado una oportunidad real para presentar su versión de los hechos. Como bien explicó el Tribunal Federal de Apelaciones para el Primer Circuito:

The ways of due process are almost infinitely variable, but

the common denominator is that the requisite hearing be granted "at a meaningful time and in a meaningful manner." Here notice of the hearing was so abrupt and uninformative as to be constitutionally deficient. [...] Absent suitable notice, the "opportunity" for plaintiff to be heard was a charade. (Citas omitidas.) *Collins v. Marina–Martinez*, 894 F.2d 474, 481 (1er Cir. 1990).

Además, la toma de la declaración jurada no fue concebida por la Policía como una vista informal. La prueba documental y, en particular, las cartas del propio Superintendente revelan, claramente, que la Policía siempre consideró a esa declaración jurada como parte del proceso investigativo. Por ejemplo, en su Carta de 2 de mayo de 1990, el Superintendente Betancourt y Lebrón le informó a Díaz Martínez que, como resultado de la investigación administrativa efectuada, se proponía imponerle como castigo su expulsión del Cuerpo de la Policía. En ese escrito se detallaron los hechos imputados y los cargos en su contra, así como su derecho a "solicitar una vista informal ante el oficial examinador dentro del término de quince (15) días laborables, contados a partir de la fecha de recibo de [la] comunicación". *Exhibit* III, pág. 3.

La vista informal fue celebrada siete (7) meses después de esta notificación. Concluida la vista, el Superintedente, con fecha de 20 de mayo de 1991, notificó a Díaz Martínez su decisión final de expulsarlo del cuerpo. La comunicación señaló que la determinación estuvo fundamentada en la prueba vertida en la vista informal celebrada el 5 de diciembre de 1990. Evidentemente, la Policía jamás consideró que la citación a la declaración jurada cumpliese los requisitos de vista previa de *Cleveland Bd. of Ed. v. Loudermill*, supra, y de *Torres Solano v. P.R.T.C.*, supra. El propósito de la toma de la declaración jurada era estrictamente investigativo y no tenía las características de una vista informal o formal.

Por otro lado, nos preocupa que en casos como éste, en que un policía amenazó con matar a una mujer, desarmó y

tomó como rehén a otro policía y encañonó a un coronel de la Uniformada, el Superintendente haya tomado nueve (9) meses en hacer la investigación administrativa y en adoptar las medidas disciplinarias correspondientes. Además, nos sorprende que transcurrieran siete (7) meses antes de celebrar la vista informal solicitada por Díaz Martínez. En vista de los intereses involucrados en este caso, el tiempo transcurrido entre la suspensión y la celebración de la vista informal fue irrazonable.

Al amparo de la normativa anteriormente expuesta, el Superintendente privó a Díaz Morales, empleado de carrera de la uniformada, de su propiedad sin el debido proceso de ley, al suspenderlo de empleo y sueldo sin antes ofrecerle una oportunidad adecuada de ser oído. Considerando los hechos del caso, y en particular el peligro significativo que representaba Díaz Martínez a sus compañeros policías y a la ciudadanía, a la luz de los hallazgos investigativos en cuanto a que desarmó a un policía y lo retuvo como rehén en un cuartel de Cataño, el Superintendente debió haber suspendido sumariamente a Díaz Martínez únicamente de empleo, pero dejándole el sueldo y demás beneficios marginales. Una vez se le ofreciera una oportunidad adecuada de ser oído en una vista informal —celebrada dentro de un término razonable de tiempo— y de entender que los hechos imputados lo ameritaban, el Superintendente podía suspender a Díaz Martínez de empleo y sueldo.

En estas circunstancias, aunque el Tribunal Superior partió de la premisa errónea que el Superintendente no podía suspender sumariamente a Díaz Martínez sin vista previa, resolvió correctamente al ordenar el pago de los salarios y beneficios que el ex policía dejó de percibir desde la fecha de su suspensión hasta el 20 de marzo de 1991, cuando el Superintendente lo expulsó definitivamente de la uniformada, después de la celebración de la vista informal. Como nuestra revisión se da contra la sentencia

y no contra sus fundamentos, *procede confirmar el dictamen recurrido.*

*Se dictará la sentencia correspondiente.*

El Juez Asociado Señor Negrón García emitió una opinión disidente, a la cual se unió el Juez Asociado Señor Rebollo López. El Juez Asociado Señor Fuster Berlingeri emitió una opinión disidente.

**– O –**

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se une el Juez Asociado Señor Rebollo López.

Es un hecho no contradicho que al Policía Miguel A. Díaz Martínez se le citó para el 30 de octubre de 1989 a una investigación administrativa de querella mucho antes de *su suspensión de empleo y sueldo.* Allí, el oficial investigador Capitán Ismael Cajigas —adscrito a la Superintendencia Auxiliar en Inspección y Asuntos Disciplinarios— le explicó en detalle el propósito de ésta, las actuaciones que se le imputaban,(¹) le brindó la oportunidad de expresar su posición, le hizo las advertencias de rigor, *su derecho a estar asistido de abogado, como en efecto lo estuvo,* e incluso que por esos hechos podía *"resultar querellado".*

El trámite anterior, equivalente a una vista informal previa a su suspensión posterior de empleo y sueldo, satis-

---

(¹) En lo pertinente le informó:

"Realiz[ó] una investigación administrativa relacionada con un incidente ocurrido el día 17 de agosto de 1989, en el Cuartelillo de la Policía de la Urb. Las Vegas de Cataño, donde usted según se alega *tomó como rehén al Policía Erick Aponte y solicitó la presencia del Superintendente de la Policía, Lcdo. Ismael Betancourt y Lebrón, para de esa forma manifestarle cierta problemática que según usted no se le había dado atención.*

"Como del resultado de esta querella usted puede resultar querellado le recuerdo el derecho de estar asistido de un abogado, como así lo estuvo por el Lcdo. Héctor Marrero, de la Asociación de Miembros de la Policía. De declarar o no declarar, y recordarle que todo lo que usted diga en esta puede ser usado en su contra.

"Hechas estas advertencias le pregunto policía Díaz, si desea declarar?" R."No señor." (Énfasis suplido.) *Exhibit* II, pág. 1.

fizo plenamente la norma de *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532 (1985), incorporada en nuestra jurisdicción en *Torres Solano v. P.R.T.C.*, 127 D.P.R. 499 (1990). El policía Díaz Martínez conocía los hechos imputados, pudo muy bien dar su versión y no lo hizo. ¿De qué se queja? ¿Se le violó realmente el debido proceso de ley?

Es improcedente e injusto reconocerle el pago retroactivo de salarios y beneficios. Hasta hoy creíamos que el debido proceso de ley era eminentemente circunstancial y pragmático; no dogmático.

– O –

Opinión disidente emitida por el Juez Asociado Señor Fuster Berlingeri.

En este caso un policía agredió y amenazó con matar a una mujer; luego desarmó y tomó como rehén a otro policía, y encañonó a otros superiores, incluyendo a un coronel de la Uniformada, todo ello sin una justificación adecuada. A pesar de la gravedad de estos actos —que ameritaban una acción administrativa inmediata— el Superintendente de la Policía mantuvo al funcionario aludido en disfrute de su cargo por espacio de nueve meses posterior al incidente delictuoso aludido, cuando al fin lo suspendió de empleo y sueldo luego de una investigación administrativa.

La investigación administrativa mencionada incluyó una *citación* al policía para tomarle una declaración jurada sobre el incidente en cuestión. Se le informó que la investigación podría dar lugar a la formulación de cargos en su contra y que tenía derecho a representación legal durante la toma de su declaración jurada. El policía en cuestión fue acompañado por abogado cuando compareció según citado y rehusó hacer una declaración jurada sobre el incidente.

Simultáneamente con la investigación administrativa referida, el Ministerio Público *presentó cargos contra el policía* por varios delitos, incluyendo los de amenaza, restric-

ción de libertad y violación de la Ley de Armas de Puerto Rico, y un Tribunal de Primera Instancia *determinó causa probable* en todos los delitos, imponiéndole fianza al policía, la cual prestó.

Frente a estos hechos contundentes, la mayoría del Tribunal sorprendentemente resuelve que el policía en cuestión tiene derecho al pago de salarios y beneficios desde la fecha de su suspensión hasta la fecha en que finalmente se le expulsó del empleo, *once meses más tarde*, todo ello porque, según la mayoría, la suspensión se hizo sin el debido proceso de ley por no haber mediado vista previa.

En otras palabras, la mayoría del Tribunal entiende que a un policía que deshonró gravemente las prerrogativas de su cargo, a quien excesiva e impropiamente se le permitió disfrutar de su sueldo y empleo durante nueve meses después del descalificante incidente, se le debe compensar por once meses adicionales porque supuestamente no se observó el debido proceso de ley al suspendérsele, aunque ya había mediado una acusación formal de varios delitos por los hechos ilícitos del policía. Además, existía una determinación judicial de causa probable respecto a la acusación, y se había celebrado una investigación administrativa sobre el incidente delictuoso, durante la cual el policía estuvo representado por un abogado, se le explicó en detalles el propósito de ésta, se le advirtió acerca de las posibles consecuencias, y se le dio la oportunidad de expresar su versión y justificación del incidente, cosa que el policía se negó a hacer.

¿CÓMO ES POSIBLE QUE EN ESTAS CIRCUNSTANCIAS LA MAYORÍA PUEDA ENCONTRAR UNA VIOLACIÓN AL DEBIDO PROCESO DE LEY?

Reiteradamente hemos resuelto que el derecho al debido proceso de ley es de naturaleza circunstancial y pragmática. *Domínguez Talavera v. Tribunal Superior*, 102 D.P.R. 423 (1974); *Pueblo v. Andreu González*, 105 D.P.R. 315 (1976); *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133

D.P.R. 521 (1993). El propio Tribunal Supremo de Estados Unidos recientemente en *Connecticut v. Doehr*, 501 U.S. 1, 10 (1991), reafirmó esta preclara concepción al repasar brevemente varios pronunciamientos afines suyos y señalar que:

> These cases underscore the truism that "due process, unlike some legal rules, *is not* a technical conception with a fixed content unrelated to time, place and circumstances".

En *Torres Solano v. P.R.T.C.*, 127 D.P.R. 499 (1990), hicimos hincapié en que el propósito de la vista informal previa al despido de un empleado público es *evitar que la agencia tome una decisión errónea que injustificadamente prive al empleado de su sustento diario, y que la vista debe servir como un escrutinio mínimo inicial para determinar si existe una justificación razonable para creer que los cargos contra el empleado son ciertos.* En este caso ese propósito se cumplió innegablemente mediante la investigación administrativa y la simultánea determinación judicial de causa probable. Cuando el Superintendente suspendió al policía de empleo *habían fundamentos más que razonables* para creer que los cargos eran ciertos; no había lugar para errores injustificados. En las circunstancias de este caso, pues, no hubo violación al debido proceso de ley, ni nada que justifique que continúen dispendiándose los fondos del pueblo para sostener por tanto tiempo a quien ha abusado de las prerrogativas de su cargo tan gravemente.

Los que tenemos la importantísima responsabilidad de velar por la protección de los derechos fundamentales de las personas tenemos aparejadamente también la encomienda de dilucidar esos derechos de manera precisa y con pleno sentido humano, no vaya a ser que los excesos en nuestro celo y las rémoras del conceptualismo resulten en un desdoro de esos derechos.

Como creo que la mayoría inusitadamente ha determinado una violación al debido proceso donde no la hay, isiento.