ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| JOSÉ CASTRO PADILLA<br><br>RECURRENTE<br><br>V.<br><br>NEGOCIADO DE LA POLICIA DE PUERTO RICO<br><br>RECURRIDO | KLRA202500135 | Revisión Administrativa procedente de la Comisión de Investigación, Procesamiento y Apelación<br><br>Núm. de Querella: 21P-70<br><br>Sobre: Expulsión |

Panel integrado por su presidente, el Juez Salgado Schwarz, el Juez Monge Gómez y la Juez Lotti Rodríguez.[1]

Lotti Rodríguez, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico a 6 de noviembre de 2025.

El Sr. José Castro Padilla (en adelante, recurrente) nos solicita que revoquemos la *Resolución* emitida el 12 de junio de 2024, enmendada y notificada el 11 de febrero de 2025[2], mediante la cual la Comisión de Investigación, Procesamiento y Apelación (en adelante, CIPA o Comisión) declaró No Ha Lugar su *Apelación* y confirmó su destitución como Agente del Negociado de la Policía de Puerto Rico (en adelante, recurrido o NPPR). Los hechos que motivaron la presentación de este recurso se detallan a continuación.

## I.

El recurrente se desempeñaba como Agente de la Policía en un puesto de carrera, adscrito a la Comandancia de Área de Mayagüez. El 14 de septiembre de 2017, al recurrente se le notificó

---

[1] Conforme la OATA-2025-065 del 6 de mayo de 2025, mediante la cual se asignó a la Juez Glorianne M. Lotti Rodríguez en sustitución del Hon. Félix R. Figueroa Cabán.

[2] Inicialmente la certificación de notificación de la *Resolución* indicaba que la misma había sido notificada el 3 de febrero de 2023. No obstante, debido al error en el año de la certificación, se emitió una *Resolución Nunc Pro Tunc* con fecha del 11 de febrero de 2025, la cual fue notificada el mismo día. Véase Apéndice del Recurrente, Anejo 1.

una *Suspensión Sumaria de Empleo y Sueldo y Resolución de Cargos*, con fecha del 13 de septiembre de 2017.[3] De la comunicación surge que, según una investigación preliminar:

> "[E]n o para el 15 de diciembre de 2016, en Mayagüez, Puerto Rico, ilegal, voluntaria, criminal e intencionalmente dañ[ó] y/o alteró y/o interrumpió el funcionamiento de las instalaciones de teléfono destinada[s] a proveer servicios públicos esenciales en la Comandancia del Área de Mayagüez. Consistente en que el imputado desprendió una clavija que va instalada en el cuadro telefónico ubicado en el Centro de Mando de la Comandancia del Área de Mayagüez, cuya función es dividir las llamadas telefónicas en diferentes extensiones. Además, desprendió los "*labels*" que identifican las diferentes extensiones; inhabilitando el cuadro telefónico; impidiendo de esta forma que una persona solicite o reciba ayuda para su vida, salud o integridad física. Hecho contrario a la ley."

Por esos alegados hechos, se sometieron cargos contra el recurrente, resultando en que el 25 de agosto de 2017 se encontrara causa para su arresto por el delito de Sabotaje de servicios esenciales, tipificado en el Artículo 240 del Código Penal de Puerto Rico, 33 LPRA sec. 5323.[4] A esos efectos, en la carta del 13 de septiembre, se le indicó al recurrente que, conforme a la determinación de causa probable parra arresto en su contra y su arresto el 25 de agosto de 2017, se le suspendía sumariamente de empleo y sueldo, efectivo a la fecha de la notificación de la comunicación, con intención, además, de expulsarlo de su puesto.

Al agente se le imputó el haber incurrido en las Faltas Graves Número 1, 23 y 27 y la Falta Leve Número 11 del Artículo 14, Sección 14.5, así como el haber violado el Artículo 5, Sección 5.2 sobre Deberes y Responsabilidades, ambas disposiciones contenidas en el Reglamento de Personal de la Policía de Puerto Rico, Reglamento Núm. 4216 del 3 de julio de 1981 (en adelante, Reglamento 4216). En particular, las Faltas señaladas consisten en lo siguiente:

---

[3] Apéndice del Recurrente, Anejo 6, págs. 17-19.

[4] No obstante, el 27 de septiembre de 2017, en la vista preliminar se desestimó la acusación y los cargos no prosperaron. Véase Determinaciones de Hechos de la *Resolución* recurrida, Apéndice del Recurrente, Anejo 2, pág. 5.

> **Falta Grave Número 1:** Demostrar incapacidad manifiesta, ineptitud, descuido, parcialidad o negligencia en el desempeño de sus deberes, funciones y responsabilidades.
> **Falta Grave Número 23:** Vender, prestar, regalar, ceder, utilizar o en cualquier forma disponer indebidamente de propiedad que haya sida puesta a su disposición para uso oficial.
> **Falta Grave Número 27:** Observar una conducta lesiva, inmoral o desordenada en detrimento del Cuerpo de la Policía.
> **Falta Leve Número 11:** Permitir que se pierda, deteriore, o se haga inservible cualquier propiedad del gobierno que le haya sido entregada para su uso o custodia. Art. 14, Sección 14.5 del Reglamento 4216.

En esta comunicación se le citó para una vista informal administrativa que se celebraría el 21 de septiembre de 2017. Sin embargo, dicha vista informal se llevó a cabo el 20 de agosto de 2018, casi un año después.[5] Según el expediente, la investigación administrativa estuvo a cargo de la Agte. María V. Chévere Rivera[6], quien, el 8 de mayo de 2019, suscribió un informe con sus hallazgos en el que concluyó que, de acuerdo con las declaraciones prestadas por varios agentes, el recurrente había incurrido en conducta que violaba los Artículos 5 y 14 del Reglamento 4216.[7] Como parte de la investigación también se obtuvo una declaración del recurrente, quien negó los hechos que resultaron en su suspensión.

A raíz de esta investigación administrativa, el Comisionado del NPPR emitió una *Resolución Final de Expulsión*, con fecha del 8 de octubre de 2020 y notificada el 10 de noviembre de 2020, donde se le indicó al recurrente que habían determinado confirmar la medida disciplinaria anteriormente anunciada y que se le expulsaba del NPPR.[8] Asimismo, se le advirtió de su derecho a apelar la decisión ante la CIPA.

---

[5] En el expediente no hay ningún informe sobre la vista informal. Asimismo, en su recurso, el recurrente señala que lo acontecido en la vista no fue tomado en consideración para el informe que preparó la Agte. María V. Chévere Rivera.
[6] Transcripción de la Prueba Oral (TPO) de la vista celebrada el 11 de diciembre de 2023, pág. 60, líneas 8-23.
[7] Apéndice del Recurrente, Anejo 6, págs. 24-32. Todas las declaraciones que, según la oficial a cargo, fundamentaron el informe fueron tomadas entre marzo y mayo de 2019, fecha posterior a la vista informal.
[8] Apéndice del Recurrente, Anejo 6, págs. 20-23.

El 8 de diciembre de 2020, el recurrente presentó su *Apelación* ante la CIPA, solicitando que se revocara su expulsión y se restituyera a su puesto con el pago retroactivo de los salarios dejados de percibir.[9] En su escrito planteó que el NPPR erró al privarlo de su sueldo por la vía sumaria, destituirlo sin que este hubiese incurrido en las violaciones imputadas y al no cumplir con el esquema de disciplina progresiva impuesto por el Reglamento 4216, según enmendado por el Reglamento para Enmendar el Artículo 14 del Reglamento de Personal de la Policía de Puerto Rico, Reglamento Núm. 9001 de 29 de agosto de 2017.

Tras varios incidentes procesales, las vistas ante la CIPA se llevaron a cabo el 30 de noviembre y el 11 de diciembre de 2023. En la vista del 30 de noviembre de 2023 estuvieron presentes el Lcdo. Manuel Díaz Morales, como Comisionado que presidió los procedimientos, los representantes legales de ambas partes y testificó la Tnte. Grace Rodríguez Torres y el Sgto. Ramón Soto Rodríguez. Por su parte, en la vista del 11 de diciembre de 2023 estuvieron presentes nuevamente el Comisionado Díaz Morales, los representantes legales de las partes y como testigos estuvieron el recurrente y la Sgto. María V. Chévere Rivera.

De la transcripción de las vistas surge que las mismas fueron presididas por el Comisionado Díaz Morales, quien fue el único miembro de la Comisión que estuvo presente en el desfile de la prueba testifical. Durante las sesiones se documentaron diversas incidencias procesales, incluyendo objeciones relacionadas con la entrega tardía de la prueba documental de la parte recurrida, limitaciones en el tiempo disponible para el desfile de prueba y restricciones en el contrainterrogatorio de algunos testigos.[10] Dichas

---

[9] Apéndice del Recurrente, Anejo 17, págs. 96-103.
[10] Véase TPO, vista celebrada el 30 de noviembre de 2023, págs. 11-12, 40, 58-61, 95-96.

incidencias quedaron debidamente consignadas por la representación legal del recurrente y obran en el expediente administrativo elevado ante este Tribunal.

El 12 de junio de 2024, la CIPA emitió su *Resolución*, enmendada y notificada el 11 de febrero de 2025[11], en la que declaró No Ha Lugar la *Apelación* presentada por el recurrente y confirmó su expulsión. La agencia expresó que su decisión se fundamentó en la credibilidad que le mereció la prueba testifical y documental presentada. En cuanto a la votación para disponer del caso, en la *Resolución* se indica que: "[p]articiparon los Comisionados Luisa Lebrón Burgos y el Presidente Designado Manuel Díaz Morales. La Comisionada Sonia Santana Sepúlveda estuvo presente, pero no intervino en la decisión."

Inconforme con este dictamen, el 5 de marzo de 2025, el recurrente presentó ante nos una *Petición de Revisión Judicial*, en la que señala la comisión de los siguientes errores:

> **ERRÓ [LA] CIPA AL VALIDAR LA SUSPENSIÓN DE EMPLEO Y SUELDO DEL PETICIONARIO DE FORMA SUMARIA[.]**
>
> **ERRÓ [LA] CIPA AL EMITIR UNA ADJUDICACIÓN BASADA EN CREDIBILIDAD SIN QUE EL PANEL TUVIESE LA OPORTUNIDAD DE ESCUCHAR LA PRUEBA TESTIFICAL[.]**
>
> **ERRÓ [LA] CIPA EN SU APRECIACIÓN DE LA PRUEBA, PARTICULARMENTE EN LA NO APLICACIÓN DEL ESQUEMA DE DISCIPLINA PROGRESIVA[.]**

En esencia, el recurrente cuestiona la legalidad de su suspensión sumaria, la validez de la adjudicación sin la participación plena del panel de la CIPA y la falta de aplicación del principio de disciplina progresiva.

Posteriormente, la parte recurrente presentó su *Alegato Suplementario* con la transcripción de las vistas celebradas y se

---

[11] Véase nota al calce 2.

ordenó, además, la elevación del expediente administrativo de la CIPA. El NPPR presentó su *Escrito en Cumplimiento de Resolución*, en el cual solicitó la confirmación de la *Resolución* recurrida, alegando que la suspensión sumaria y la destitución del recurrente fueron conformes a derecho, al haberse fundado en una determinación previa de causa probable por delito grave y en evidencia sustancial que demostró las faltas imputadas. Elevado el expediente y presentados los alegatos de ambas partes, el caso quedó sometido para adjudicación.

Examinado el tracto procesal y los planteamientos esbozados por ambas partes, procedemos a exponer las normas de derecho aplicables y su aplicación a los hechos del caso.

**II.**

**A. Revisión judicial de decisiones administrativas**

La Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAU), Ley Núm. 38 de 30 de junio de 2017, según enmendada, 3 LPRA sec. 9601 *et seq.* establece el marco normativo que rige la revisión judicial de las decisiones emitidas por las agencias administrativas. *Otero Rivera v. Bella Retail Group, Inc.*, 214 DPR 473, 484 (2024). El propósito de la revisión judicial es limitar la discreción de las agencias y asegurarse de que éstas desempeñen sus funciones conforme a la ley. *García Reyes v. Cruz Auto Corp. y Scotiabank*, 173 DPR 870, 891-892 (2008), citando a *Torres v. Junta de Ingenieros*, 161 DPR 696, 707 (2004) y *a Miranda v. CEE*, 141 DPR 775, 786 (1996).

Es norma reiterada que, al revisar las determinaciones administrativas, este foro apelativo está obligado a conceder deferencia a las decisiones de las agencias en vista de que estas poseen la experiencia y el conocimiento especializado respecto a los asuntos que les han sido delegados. *Katiria´s Café, Inc. v. Municipio Autónomo de San Juan*, 2025 TSPR 33, 215 DPR ___ (2025), citando

a *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35 (2018); *Torres Rivera v. Policía de PR*, 196 DPR 606, 626 (2016); *Pagán Santiago et al. v. ASR*, 185 DPR 341, 358 (2012). Por lo tanto, los tribunales deben ser cautelosos al intervenir con las decisiones administrativas. *Metropolitana, SE v. ARPE*, 138 DPR 200, 213 (1995); *Viajes Gallardo v. Clavell*, 131 DPR 275, 289–290 (1992).

En virtud de lo anterior, el criterio rector al momento de pasar juicio sobre una decisión de la agencia recurrida es la razonabilidad de la actuación cuestionada. *Katiria´s Café, Inc. v. Municipio Autónomo de San Juan, supra*. (Énfasis nuestro). Así pues, debemos evaluar que no se haya actuado de manera arbitraria o ilegal, o de forma tan irrazonable que constituya un abuso de discreción. *Torres Rivera v. Policía de PR, supra*. Por consiguiente, no puede otorgárseles un "sello de corrección automático bajo el pretexto de deferencia a aquellas determinaciones o interpretaciones administrativas que son irrazonables, ilegales o contrarias a Derecho". *Capote Rivera v. Voilí Voilá Corp.*, 213 DPR 743, 754 (2024). Es decir, si bien debemos concederles una amplia deferencia a las determinaciones de las agencias administrativas, dicha norma no es absoluta. *Id.*

A esos efectos, la deferencia cede cuando: "**(1) la decisión no está basada en evidencia sustancial**; (2) el organismo administrativo ha errado en la aplicación o interpretación de las leyes o los reglamentos; **(3) ha mediado una actuación arbitraria, irrazonable o ilegal**; o (4) la actuación administrativa lesiona derechos constitucionales fundamentales". *Id.,* citando a *Super Asphalt v. AFI y otro*, 206 DPR 803, 819 (2021). (Énfasis nuestro).

El alcance de la revisión judicial de las determinaciones administrativas se extiende a los siguientes tres aspectos: "(1) si el remedio concedido por la agencia fue apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas

por evidencia sustancial que obra en el expediente administrativo visto en su totalidad, y (3) si, mediante una revisión completa y absoluta, las conclusiones de derecho del ente administrativo fueron correctas". *Rolón Martínez v. Supte. Policía, supra*, pág. 36, citando a *Pagán Santiago et al. v. ASR, supra.*

Las determinaciones de hechos de las agencias no serán alteradas por los tribunales "si las mismas están sostenidas por evidencia sustancial que surja del expediente administrativo considerado en su totalidad". *Otero v. Toyota*, 163 DPR 716, 727-728 (2005); *Domínguez v. Caguas Expressway Motors, Inc.*, 148 DPR 387, 397 (1999). A estos fines, se ha definido evidencia sustancial como "aquella [evidencia] pertinente que una mente razonable pueda aceptar como adecuada para sostener una conclusión". *Ramírez v. Depto. de Salud*, 147 DPR 901, 905 (1999).

Para establecer la alegación de ausencia de tal evidencia sustancial, la parte afectada debe demostrar que existe "otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia hasta el punto de que un tribunal no pueda concienzudamente concluir que la evidencia sea sustancial hasta el punto de que se demuestre claramente que la decisión [de la agencia] no está justificada por una evaluación justa del peso de la prueba". *Metropolitana SE v. ARPE*, 138 DPR 200, 213 (1995) (citando a *Hilton Hotels International Inc. v. Junta de Salario Mínimo*, 74 DPR 670, 686 (1953)).

En otras palabras, la parte afectada por la determinación de la agencia viene obligada a derrotar la presunción de corrección de los procesos y de las decisiones administrativas. *Otero v. Toyota, supra*, pág. 728; *Domínguez v. Caguas Expressway Motors, Inc., supra*, págs. 397-398. Para lograr ese objetivo, tiene que demostrar que existe otra prueba en el récord que menoscabe el valor probatorio de la evidencia impugnada. *Misión Ind. PR v. JP*, 146 DPR

64, 132 (1998); *Metropolitana SE v. ARPE, supra*; *Hilton Hotels International Inc. v. Junta de Salario Mínimo, supra*. Si la parte afectada no demuestra la existencia de esa otra prueba, las determinaciones de hechos de una agencia deben ser sostenidas por el tribunal revisor. *Ramírez v. Depto. de Salud, supra.*

Por otro lado, reiteramos que, cuando se trate de conclusiones de derecho que no involucren interpretaciones efectuadas dentro del ámbito de especialización de la agencia, éstas serán revisables por los tribunales sin circunscribirse al razonamiento que haya hecho la agencia. *Rivera v. A & C Development Corp.*, 144 DPR 450, 461 (1997). Asimismo, cuando se trate de la revisión de determinaciones que estén entremezcladas con conclusiones de derecho, el foro judicial tendrá amplia facultad de revisión, como si se tratara de una cuestión de derecho propiamente. *Id.*, citando a D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme,* Ed. Forum, 1993, págs. 548-550.

### B. Debido proceso de ley

La Constitución de Puerto Rico dispone en su Artículo II, Sección 7, que "ninguna persona será privada de su propiedad o libertad sin un debido proceso de ley". Art. II, Sec. 7, Const. PR, LPRA, Tomo 1. El debido proceso de ley se refiere al "derecho de toda persona a tener un proceso justo y con todas las garantías que ofrece la ley, tanto en el ámbito judicial como en el administrativo". *Marrero Caratini v. Rodríguez Rodríguez,* 138 DPR 215, 220 (1995).

La garantía del debido proceso de ley opera en dos vertientes distintas: la procesal y la sustantiva. La vertiente sustantiva del debido proceso de ley persigue proteger y salvaguardar los derechos fundamentales de las personas. *Landrau Cabezudo et al. v. Puertos et al.*, 2025 TSPR 7, 215 DPR ___, (2025); *Fuentes Bonilla v. ELA et al.*, 200 DPR 364, 394 (2018); *Rivera Rodríguez & Co. v. Lee Stowell, Etc.*, 133 DPR 881, 887 (1993). Mientras que la vertiente procesal le

impone al Estado la obligación de garantizar que la interferencia con los intereses de libertad y de propiedad del individuo se haga a través de un procedimiento que sea justo y equitativo. *Landrau Cabezudo et al. v. Puertos et al., supra*; *Picorelli López v. Depto. de Hacienda*, 179 DPR 720, 735-736 (2010); *Rivera Rodríguez & Co. v. Stowell Taylor, supra*, págs. 887-888.

Para que se active la protección que ofrece este derecho en su vertiente procesal, tiene que existir, en primer lugar, un interés individual de libertad o propiedad que se vea afectado por una acción del Estado. *Domínguez Castro et al. v. ELA I*, 178 DPR 1, 46 (2010); *Rodríguez Rodríguez v. ELA*, 130 DPR 562, 578 (1992); *Rivera Santiago v. Srio. de Hacienda*, 119 DPR 265, 273-274 (1987); *Board of Regents v. Roth*, 408 US 565, 569 (1972). En segundo lugar, se debe determinar las características mínimas con las que debe cumplir el proceso mediante el cual el Estado pretende afectar negativamente ese derecho constitucionalmente protegido. *Domínguez Castro et al. v. ELA I, supra.*

Por ello, se han establecido varios requisitos con los que debe cumplir todo procedimiento adversativo para satisfacer las exigencias mínimas del debido proceso de ley, en su vertiente procesal. *Id.*, pág. 47. Estos son: (1) notificación adecuada del proceso; (2) proceso ante un juez imparcial; (3) oportunidad de ser oído; (4) derecho a contrainterrogar testigos y examinar evidencia presentada en su contra; (5) tener asistencia de abogado, (6) que la decisión se base en el récord, y (7) que la decisión final sea explicada o fundamentada. *Id.*, págs. 47-48.

Estos requisitos se entienden satisfechos siempre que se brinde a las partes oportunidad real de exponer sus planteamientos y situar al foro en posición de adjudicar adecuadamente las controversias.

### C. Ley de la Policía de Puerto Rico

La Ley de la Policía de Puerto Rico de 1996, Ley Núm. 53 de 10 de junio de 1996, 25 LPRA ant. sec. 3101 *et seq.*[12], tuvo como propósito darle uniformidad a la estructura operacional de la Policía para hacer más ágil su administración y la utilización de sus recursos. Exposición de Motivos, Ley Núm. 53-1996. Para lograrlo se creó el Cuerpo de la Policía de Puerto Rico, cuya obligación sería:

> [P]roteger a las personas y a la propiedad, mantener y conservar el orden público, observar y procurar la más absoluta protección de los derechos civiles del ciudadano, prevenir, descubrir, investigar y perseguir el delito y, de la esfera de sus atribuciones, compeler obediencia a las leyes y ordenanzas municipales, y reglamentos que conforme a éstas se promulguen. 25 LPRA sec. 3102.

Para asegurar el cumplimiento de estos deberes, el legislador delegó en el Superintendente la facultad de determinar por reglamento "la organización y administración de la Policía, las obligaciones, responsabilidades y conducta de sus miembros [...] y cualquier otro asunto necesario para el funcionamiento del Cuerpo." 25 LPRA sec. 3104. Asimismo, se le confirió la discreción de ejercer toda facultad o poder para el buen funcionamiento de la Policía, siempre que no estuviese en conflicto con otras disposiciones de la Ley. *Id.*

De igual forma, el estatuto otorgaba al Superintendente la facultad de determinar, mediante reglamento, las faltas graves o leves de los miembros de la Policía que conllevaren acción disciplinaria, así como el trámite que debía seguirse en cada caso. 25 LPRA sec. 3122. En ese sentido, la Ley establecía que el castigo por faltas graves podría ser uno de los siguientes: reasignación de funciones o reubicación, traslado, expulsión permanente del

---

[12] El 10 de abril de 2017, entró en vigor La Ley del Departamento de Seguridad Pública de Puerto Rico, 25 LPRA sec. 3501 *et seq.*, Sin embargo, los hechos que dieron lugar a la determinación del NPPR ocurrieron previo a la fecha de vigencia de la precitada Ley, por lo que haremos referencia y esbozaremos el derecho a la luz del derogado estatuto.

Cuerpo, degradación o **suspensión de empleo sin sueldo por un período no mayor de cinco (5) meses.** *Id.* (Énfasis nuestro).

A su vez, el estatuto provee el trámite que se deberá seguir en casos de faltas graves. 25 LPRA sec. 3122. En específico, el Artículo 23 dispone lo siguiente:

> (b) Trámite de faltas graves:
> (1) El expediente de investigación de todo cargo grave incluirá un informe completo en torno a las imputaciones hechas contra el miembro o miembros de la Fuerza querellados. **El trámite de investigación y envío del expediente se hará sin demora innecesaria.** El reglamento determinará los oficiales que intervendrán en el expediente de investigación.
>
> (2) **El castigo a imponerse por faltas graves podrá ser** uno de los siguientes: reasignación de funciones o reubicación, traslado, expulsión permanente del Cuerpo, degradación o **suspensión de empleo sin sueldo por un período no mayor de cinco (5) meses.**
>
> […]
>
> (4) **El Superintendente tendrá facultad para suspender temporalmente de empleo a cualquier miembro de la Fuerza mientras se practica cualquier investigación que se ordenare relativa a incompetencia, mala conducta o crimen de que se acuse a dicho miembro de la Fuerza. En tal caso, el Superintendente hará que se formulen los correspondientes cargos, sin demora innecesaria. Investigará y resolverá tales casos a la mayor brevedad posible, imponiendo el castigo que estime razonable dentro de los límites de ésta** o disponiendo que vuelva al servicio dicha persona con devolución de los sueldos devengados o sin ellos, durante el período de la suspensión, si a su juicio los hechos lo justificaren.
>
> […]
>
> (6) El Superintendente, luego de examinar y analizar el expediente y de dar al querellado la oportunidad de ser escuchado, resolverá el caso, absolviendo al querellado o imponiendo el castigo que estime razonable, según lo dispone la cláusula (2) de este inciso. Si se declara incurso en falta el miembro o miembros de la Fuerza concernidos, el Superintendente entregará copia al querellado del documento contentivo de su decisión, lo que se comprobará por medio de la firma de éste e indicando la fecha y hora de la notificación. El procedimiento para estos casos se determinará mediante reglamento.
>
> […]

(8) Todo miembro de la Fuerza contra quien se haya dictado una decisión adversa por el Superintendente, podrá apelar el caso ante la Comisión de Investigación, Procesamiento y Apelación, creada mediante la Ley Núm. 32, aprobada el de 22 de Mayo de 1972, (1 LPRA secs. 171 *et seq.*), ante la cual tendrá derecho a vista conforme a los términos de dichas secciones. La apelación deberá presentarse dentro de los treinta (30) días de recibir la notificación de castigo. *Id.*

Así pues, el Superintendente posee la facultad de imponer sanciones a miembros de la Policía que hayan cometido faltas graves, conservando, además, la discreción de suspender sumariamente a un miembro de la policía en casos donde a este se le haya acusado de algún crimen. No obstante, del estatuto surge claramente el requisito de que los procesos de investigación se lleven a cabo sin demora necesaria y que el período máximo por el cual se puede imponer la suspensión de empleo y sueldo como sanción disciplinaria es de solo cinco (5) meses.

**D. Reglamento de Personal de la Policía de Puerto Rico**

Previo a la aprobación de la citada Ley Núm. 53-1996, se adoptó el Reglamento de Personal de la Policía de Puerto Rico, Reglamento Núm. 4216 de 11 de mayo de 1990, según enmendado.[13] En virtud de este Reglamento se facultó al Superintendente de la Policía de Puerto Rico para imponer las acciones disciplinarias necesarias cuando un miembro de la Policía de Puerto Rico incurra en violación de cualquiera de las faltas clasificadas en graves o leves. A esos efectos, el Artículo 14, Sección 14.3, dispone lo siguiente sobre las acciones disciplinarias a miembros de la Policía de Puerto Rico:

a. El Superintendente tomará las medidas correctivas apropiadas cuando un miembro de la Policía de Puerto Rico incurra en violación de cualquiera de las faltas clasificadas en graves o leves. **El castigo a imponerse por falta grave podrá ser** uno de los siguientes:

---

[13] El precitado Reglamento fue enmendado por el Reglamento para Enmendar el Artículo 14 del Reglamento de Personal de la Policía de Puerto Rico, Reglamento Núm. 9001 de 29 de agosto de 2017. No obstante, para efectos de la discusión debemos atender las disposiciones del Reglamento 4216 previo a la enmienda ya que los hechos que dieron lugar a la determinación del NPPR ocurrieron antes de que entrara en vigor las enmiendas al Reglamento.

expulsión del Cuerpo, degradación o **suspensión de empleo y sueldo por un período no mayor de cinco (5) meses**, y el castigo a imponerse por falta leve podrá ser uno de los siguientes: suspensión de empleo y sueldo por un período que no exceda de diez (10) días y/o amonestación escrita.

b. Procedimiento sobre Acciones Disciplinarias para Miembros de la Policía de Puerto Rico.

(1) En todo caso que surja la posibilidad de aplicación de medidas disciplinarias por violación a cualquier falta cuya sanción pudiera resultar en la suspensión de empleo y sueldo, destitución o expulsión, o degradación, se adoptara el siguiente procedimiento:

> (a) El Superintendente iniciará una investigación administrativa dentro de los diez (10) días laborables desde que tuvo conocimiento oficial de los hechos o de la radicación de una querella. Luego de esto hará una determinación de si procede tomar alguna medida disciplinaria. [...]

> (b) **En aquellos casos de** mal uso de fondos públicos, incompetencia, mala conducta o **crimen de que se acuse a dicho miembro de la Fuerza,** o cuando haya motivo razonable que exista un peligro real para la salud, seguridad, vida o moral de los empleados o del Pueblo en general, **el Superintendente podrá suspender sumariamente de empleo y sueldo al miembro de la Fuerza antes de la vista administrativa.** (Énfasis nuestro).

Ahora bien, la facultad que brinda el Reglamento 4216 al Superintendente para suspender sumariamente de empleo y sueldo a un empleado dentro de las circunstancias antes indicadas, no exime el cumplimiento de celebrar una vista informal dentro de un término razonable de tiempo, donde se le brinde una oportunidad de ser oído. *Díaz Martínez v. Policía de PR*, 134 DPR 144, 153 (1993).

### E. Suspensión sumaria de empleo y sueldo

A los empleados públicos de carrera, como lo son los policías del NPPR, se les ha reconocido un interés en la retención de su empleo, si dicho interés está protegido por la ley (empleado de carrera) o cuando las circunstancias crean una expectativa de continuidad. *Díaz Martínez v. Policía de PR, supra,* pág. 148; *Orta v. Padilla Ayala,* 131 DPR 227, 241 (1992). Es decir, los empleados que tienen un interés propietario en sus puestos tienen derecho a

las garantías de un debido proceso de ley en su vertiente procesal, antes de ser destituidos o separados de su empleo. *Garriga Villanueva v. Mun. de San Juan,* 176 DPR 182, 196-197 (2009).

Una medida disciplinaria, aun cuando no sea una destitución, puede afectar la tenencia de empleo del servidor público de carrera. *Díaz Martínez v. Policía de PR, supra,* pág. 150. Por tanto, tal curso de acción requiere el cumplimiento con la vertiente procesal del debido proceso de ley. En ese sentido, las garantías mínimas que tienen los empleados son: una notificación adecuada de los cargos, una descripción de la prueba que posee el patrono en su contra y una vista informal que le brinde al empleado la oportunidad de presentar su versión de los hechos. *Íd.* Véase, además, *Calderón Otero v. CFSE,* 181 DPR 386, 399 (2011); *Garriga Villanueva v. Mun. de San Juan, supra,* pág. 197 (2009).

Asimismo, en el contexto específico de la Policía de Puerto Rico, aunque existen circunstancias en las que no se requiere que se le provea a un policía la oportunidad de ser oído en una vista informal antes de una suspensión sumaria, nuestro Tribunal Supremo ha resuelto que, **una vista informal previa reduce los peligros de que un procedimiento de esta índole prive erróneamente de su interés propietario a un policía.** *Díaz Martínez v. Policía de PR, supra,* pág. 151. (Énfasis nuestro).

### F. Ley de la Comisión de Investigación, Procesamiento y Apelación (CIPA)

La Ley de la Comisión de Investigación, Procesamiento y Apelación, Ley Núm. 32 de 22 de mayo de 1972, según enmendada, 1 LPRA sec. 171 *et seq.,* se promulgó con el fin de crear una comisión para atender los casos de mal uso o abuso de autoridad de ciertos funcionarios públicos y fungir como foro apelativo en determinados casos. *Arocho v. Policía de PR,* 144 DPR 765, 769-770

(1998). La Asamblea Legislativa facultó a la CIPA como el "cuerpo apelativo con jurisdicción exclusiva para oír y resolver apelaciones" interpuestas por funcionarios públicos cubiertos por ley, sobre los que se hayan impuesto medidas disciplinarias con relación a una falta grave. 1 LPRA sec. 172 (2); *Ramírez v. Policía de PR*, 158 DPR 320, 332 (2002). A esos efectos, la CIPA es el foro administrativo con conocimiento especializado en la adjudicación de estos casos. *González y otros v. Adm. de Corrección*, 175 DPR 598, 607-608 (2009), citando a *Arroyo v. Policía de PR, supra.*

Como parte de las facultades conferidas, la CIPA tiene autoridad para: (1) realizar cualquier investigación autorizada por ley, en cualquier sitio en el Estado Libre Asociado de Puerto Rico; (2) celebrar las reuniones que considere necesarias; (3) celebrar vistas públicas o privadas, las cuales podrán ser presididas por cualquier Comisionado que designe el Presidente y con audiencia de las partes interesadas. 1 LPRA sec. 173. En cuanto a este último aspecto, nuestro Tribunal Supremo ha resuelto que las vistas celebradas ante la CIPA son una especie de juicio de *novo*, donde la agencia tiene la oportunidad de escuchar toda la evidencia y otorgarle el valor probatorio que a su juicio merezca la misma. *Ramírez v. Policía de PR, supra*; *Arroyo v. Policía de PR, supra*, pág. 772.

La Ley Núm. 32-1972 provee, además, para que la CIPA adopte los reglamentos necesarios para la realización efectivas de sus funciones. 1 LPRA sec. 180. A esos efectos, se adoptó el Reglamento para la Presentación, Investigación y Adjudicación de Querellas y Apelaciones ante la Comisión de Investigación, Procesamiento y Apelación, Reglamento Núm. 7952, aprobado el 1 de diciembre de 2010, con el propósito de establecer las normas para regular los procedimientos ante la CIPA. Art. 2 del Reglamento Núm. 7952.

El Artículo 21 del citado Reglamento establece el procedimiento relacionado a la celebración de vistas públicas. En específico, dispone que "**[l]as vistas podrán celebrarse ante la Comisión constituida por tres o más miembros. También podrán ser presididas por un comisionado**, juez administrativo o abogado examinador. **Tres comisionados constituirán quórum para adjudicar.**" Art. 21 del Reglamento Núm. 7952. (Énfasis nuestro). De la misma forma lo establecen el Artículo 1 de la Ley Núm. 32-1972, cuando dispone que "**[t]res Comisionados constituirán quórum para tomar acuerdos**", 1 LPRA sec. 171, y el Artículo 3, que indica que "**[l]os casos en que la Comisión intervenga podrán ser vistos por tres o más miembros de la Comisión.**" 1 LPRA sec. 173. (Énfasis nuestro).

Sobre el quórum requerido para la Comisión, es preciso destacar la apreciación que hizo el Tribunal Supremo en *Pueblo v. Torres Santiago*, 175 DPR 116, 129 (2008), donde utilizando como ejemplo a la CIPA, señaló que la propia ley orgánica de la agencia estableció cual es el quórum necesario para tomar acuerdos. Allí resaltó que, en particular en el caso de la CIPA, **constituirán quórum para tomar acuerdos tres de los cinco comisionados que componen el organismo.**1 LPRA sec. 173. (Énfasis nuestro). Es decir, la naturaleza de la CIPA establece el requisito de que los procesos adjudicativos se lleven a cabo frente a una Comisión que se podrá componer por tres o más comisionados, sin darle paso a la posibilidad de que se adjudiquen casos por paneles integrados por menos de tres comisionados.

Por otro lado, nuestro más Alto Foto ha resuelto que la vista celebrada ante la CIPA "es propiamente una vista formal, porque en ella se ventilan de manera definitiva, a nivel administrativo, todos los derechos del empleado, y las determinaciones de hecho de esa agencia están sujetas, únicamente, al limitado ámbito de la revisión

judicial. En ese sentido, es equivalente a un juicio en sus méritos". *Ramírez v. Policía de PR, supra,* pág. 334. Es decir, las actuaciones de la CIPA se asemejan a las de un tribunal, debido al poder de adjudicación que le fue delegado. Por tal razón, **el examinador o comisionado que presida las vistas debe ajustarse a los principios básicos que rigen la discreción judicial.** *Id.,* pág. 340. (Énfasis nuestro).

Al tratarse de un juicio de *novo,* la CIPA tiene la autoridad para recibir y valorar prueba como parte de su función apelativa, así como de escuchar nuevamente toda la prueba presentada ante la autoridad administrativa, admitir nueva evidencia y asignarle el valor probatorio que estime procedente. *Ramírez v. Policía de PR¸ supra,* pág. 332; *Arroyo v. Policía de PR, supra,* pág. 772.

Por lo tanto, al momento de adjudicar las controversias planteadas ante sí, la Comisión debe hacer determinaciones de credibilidad. A esos efectos, el Tribunal Supremo de Puerto Rico ha establecido que "**[l]a tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada**, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". *Ortiz Ortiz v. Medtronic,* 209 DPR 759, 778-779 (2022), citando a *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013). (Énfasis nuestro).

La Comisión, luego de celebrar la vista correspondiente, según lo dispuesto en el Artículo 3, inciso (3) de la Ley, podrá confirmar, revocar o modificar la determinación o actuación de la cual se hubiere apelado, o podrá imponer cualquier sanción que la autoridad facultada para sancionar hubiese podido imponer. 1 LPRA sec.172 (2).

**III.**

Del examen del expediente administrativo y de la prueba presentada ante la CIPA se desprende que al recurrente se le imputó haber desprendido una clavija y unas etiquetas del cuadro telefónico de la Comandancia de Mayagüez, en la cual se desempeñaba como agente de la policía, lo que alegadamente interrumpió su funcionamiento el 15 de diciembre de 2016.[14] Por estos hechos, el 25 de agosto de 2017, se encontró causa para el arresto del recurrente por delito grave y, un mes después, el 27 de septiembre de 2017, celebrada la vista preliminar el cargo fue desestimado.[15] No obstante, el NPPR, fundamentado en la determinación de causa probable para arresto del 25 de agosto de 2017, suspendió sumariamente al recurrente, de empleo y sueldo, y tras un trámite administrativo que se extendió por más de tres años, lo destituyeron de su puesto mediante *Resolución* emitida en octubre de 2020. Inconforme, el recurrente acudió a la CIPA, quien confirmó la sanción y posteriormente acudió ante este Tribunal de Apelaciones mediante el recurso que nos ocupa.

En su primer señalamiento de error el recurrente alega que la CIPA erró al validar la suspensión de empleo y sueldo de forma sumaria, sin cumplir con el debido proceso de ley. Sin embargo, del expediente se desprende que el NPPR actuó dentro de sus facultades al imponer inicialmente una suspensión sumaria, ya que existía una determinación de causa probable por un delito grave vinculado a los hechos investigados. En esa instancia se podía suspender al recurrente sin necesidad de que se celebrase una vista previa, siempre que se le brindara la oportunidad de ser oído una vista informal posterior.

---

[14] No hay evidencia de a quien pertenecía dicha clavija, ya que el recurrente alegó que era suya y el NPPR no pudo comprobar lo contrario. Tampoco quedó probado que la remoción de este artefacto impidiera el funcionamiento del equipo.
[15] Véase Determinaciones de Hechos de la *Resolución* recurrida, Apéndice del Recurrente, Anejo 2, pág. 5.

Sin embargo, aunque la suspensión sumaria inicial del recurrente no fue en sí misma contraria a derecho, la Ley Núm. 53-1996 y el Reglamento 4216 permiten que esta suspensión fuese sólo por un período que no excediera los cinco (5) meses. En este caso, el expediente refleja que el agente permaneció suspendido sin sueldo por más de tres años antes de concluir el procedimiento administrativo que culminó en su destitución. Tal dilación desvirtúa el carácter sumario de la medida y representa una actuación desproporcionada, irrazonable e incompatible con el debido proceso de ley. Por ende, aunque no procede revocar la *Resolución* de la CIPA por la suspensión sumaria, sí debemos reconocer que la extensión excesiva de esta constituyó una violación procesal sustancial que, por el tiempo transcurrido, afecta el resultado final del procedimiento.

En su segundo planteamiento de error, el recurrente también plantea que la CIPA erró al emitir su resolución basada en la apreciación de credibilidad de testigos a los cuales no todos los comisionados tuvieron oportunidad de escuchar directamente. Entendemos que este error sí se cometió.

La CIPA incurrió en una actuación incompatible con las garantías mínimas del proceso adjudicativo al emitir su resolución basada en la apreciación de credibilidad de testigos a los que no todos los comisionados tuvieron oportunidad de escuchar directamente. La evidencia testifical fue recibida exclusivamente por el Comisionado Díaz Morales, mientras que las Comisionadas Lebrón Burgos y Santana Sepúlveda no estuvieron presentes en la vista.

Al así proceder no se justifica que la decisión se basara en la credibilidad a que uno solo de los comisionados le merecieran los testimonios desfilados en la vista. La valoración de la prueba testifical exige que el juzgador haya observado el comportamiento,

lenguaje corporal o *demeanor* de los testigos, elementos esenciales para formar juicio sobre su credibilidad.  En su *Resolución* la CIPA expresa que "[l]a Comisión simplemente no da crédito a las explicaciones y el testimonio provisto por el Ex Agte. Castro Padilla." Sin embargo, del expediente surge que esa valorización de credibilidad solo la pudo realizar el Comisionado Díaz Morales ya que los otros dos miembros de la Comisión no estuvieron presentes para darle valor a lo declarado por los cuatro testigos que comparecieron ante la agencia.

Finalmente, en el tercer señalamiento de error, el recurrente argumenta que la CIPA erró al no aplicar el esquema de disciplina progresiva dispuesto en el Reglamento 4216, según enmendado por el Reglamento 9001. Sin embargo, este Tribunal advierte que al momento de los hechos —ocurridos en diciembre de 2016 y procesados bajo el Reglamento 4216, antes de la entrada en vigor del Reglamento 9001 de 2017— no existía un esquema mandatorio de disciplina progresiva. Las sanciones administrativas quedaban sujetas a la discreción del NPPR de acuerdo con la naturaleza y gravedad de la falta cometida. En consecuencia, aun cuando la Policía no aplicó medidas intermedias antes de la destitución, tal omisión no constituye un defecto procesal que, por sí solo, conlleve la revocación de la resolución impugnada.

**IV.**

Por los fundamentos antes expuestos, se revoca la *Resolución* recurrida y se devuelve el caso a la agencia para la celebración de un nuevo procedimiento conforme a derecho.

Notifíquese.

Lo acordó el Tribunal, y lo certifica la Secretaria del Tribunal.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones